UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:11-CV-00403-H

SHANA PERRY, *et al.*                                                      PLAINTIFFS

V.

AUTOZONERS, LLC                                                           DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Shana Perry, Daryl Quiney and Damon Harper brought suit against their former employer, Defendant AutoZoners, LLC ("Autozone")[1] for alleged injuries suffered during their employment.  Autozone filed two motions for summary judgment.  First, Autozone moved for summary judgment against Quiney and Harper on their joint claims for racial discrimination and retaliation.  In a prior order, this Court dismissed all of Quiney and Harper's claims, except for the racial discrimination claims based on their terminations.  ECF No. 71.

Presently before the Court is Autozone's motion for summary judgment as to Perry's claims.  After consideration of the lengthy briefs filed pursuant to this motion and oral argument by the parties, the Court will grant in part and deny in part Autozone's motion for summary judgment.  The Court has also reconsidered its dismissal of the retaliation claims of Quiney and Harper.  The Court will reinstate those claims premised upon their terminations.

I.

The highly unusual and even bizarre circumstances of this case contribute to the Court's difficulty in concluding a definitive analysis.  The Court summarized the facts in its first opinion. The following are more tailored to Perry's claims.

---

[1] In its June 4, 2013 order, this Court dismissed all other defendants originally sued in this action.  ECF No. 71.

Autozone hired Perry in 1998 as a sales cashier at Store No. 603 located on Dixie Highway in Louisville, Kentucky (the "Shively Store").   Three months later, Autozone transferred Perry to Store No. 612 located on Broadway, also in Louisville, Kentucky (the "Broadway Store").   She worked as a sales cashier there until some point in 2008, when Autozone promoted her to Commercial Sales Specialist.   In July of 2009, Perry became a member of management when Autozone promoted her to Commercial Sales Manager.   During the summer of 2010, the relevant time period for this case, Mark DeHaan served as Manager of the Broadway Store.

On June 14, 2010, Perry claims to have experienced her first incident of sexual harassment when she visited the Broadway Store while off-duty.   That day, DeHaan swatted her backside with a rolled up piece of paper and allegedly told Perry's daughter that he would be her new stepfather.   Around two weeks later, Perry contends that DeHaan engaged in frequent and persistent sexual harassment against her in the workplace, the details of which are lengthy and unnecessary to delve into presently, because the parties do not dispute the existence and nature of the incidents.   During this time, Perry would tell DeHaan to cease his unrelenting behavior. However, he did not heed her requests, as the sexual harassment continued for three weeks.

On Friday, July 23, 2010, Perry conferred with the Broadway Store Assistant Manager, co-Plaintiff Quiney, and the two decided that Perry should report DeHaan.   Perry called Dawn Brandenburg, the Regional Human Resources Manager, to request a meeting without indicating the reason for it.   The following Monday, July 26, 2010, Brandenburg and Perry met, and Perry divulged the particulars of DeHaan's conduct over the past month and a half.   Allegedly, Brandenburg informed Perry that to carry through with the complaint against DeHaan, she must sign a written form documenting the specific allegations and acknowledging that she could be

fired for her participation in the complaint.  Perry agreed.  She also indicated she did not feel comfortable working with DeHaan any longer, and Perry voluntarily assented to a temporary transfer to the Shively Store while Brandenburg investigated the accusations.  While at the Shively Store on July 27, 2010, DeHaan called Perry to tell her that her transfer to the Shively Store was to be permanent, because Helstern had determined that her job performance was poor.

On July 29, 2010, Brandenburg conducted a formal interview with Perry.  In the interim and per Brandenburg's instructions, Perry prepared a written statement documenting DeHaan's inappropriate behavior and naming three witnesses to her harassment, two of whom are plaintiffs in the present action.  Brandenburg allegedly again asked Perry to sign a document acknowledging that she could be fired for participating in the investigation.  On August 3, 2010, Brandenburg interviewed Plaintiffs Quiney and Harper, who corroborated some of Perry's accounts.  The following day, Brandenburg interviewed DeHaan, who admitted to much of the behavior.  Brandenburg suspended DeHaan immediately.  She then forwarded the documents prepared during the investigation to her supervisor, Divisional Human Resources Manager Rich Thomson, who recommended DeHaan's termination for violating Autozone's sexual harassment policy.  Regional Manager Jay Campbell approved the termination, and District Manager Donnie Helstern communicated the termination to DeHaan on August 6, 2010.  Days later, Helstern communicated termination notices to Quiney and Harper, allegedly as a result of their failure to promptly report the sexual harassment they had witnessed.

After DeHaan's termination, Perry returned to her position as Commercial Sales Manager at the Broadway Store under new Store Manager Jacob Limbach.  She filed a charge with the Equal Employment Opportunity Commission on August 10, 2010, alleging sexual discrimination and retaliation.  ECF No. 55-9.  That same day, Helstern issued Perry a

Corrective Action Review ("CAR"), on which he noted that the form was a "documentation of a verbal communication" regarding her failure to timely report her own sexual harassment and apparently her failure to comply with confidentiality requirements during the investigation.

Perry claims that her employment experience over the next several months, aside from the period she was on medical leave, was difficult. She claims Autozone stripped her of her store keys even though the other managers retained theirs. She received harassing phone calls at work from employees angry at her for getting the other men fired. When she reported these incidents to Helstern, he told her to get thicker skin. According to Perry, Helstern accused her of giving parts to customers without receiving payment, and that she had special relationships with certain customers with whom she colluded to steal from Autozone.

Perry claims that Helstern called her incessantly, three to four times a day. One of these calls allegedly came before her shift began, so she would always have a message waiting for her upon arrival. Helstern would question whether she attended conference calls and spoke down to her frequently. When Perry complained about this treatment, Helstern told her that she did not have the right to question his manner of speaking to her and informed her that she could be reprimanded for insubordination. She reported Helstern's behavior to Limbach, who she claims did nothing in response.

On February 4, 2011, Perry called Brandenburg to request a transfer to the Shively Store, reasoning that she could no longer work under Helstern. Brandenburg wanted Perry to sign a formal request for transfer, but Perry refused. She claims Brandenburg would not include on the transfer request form the reason for the request, so she was unwilling to sign the document. Perry remained at the Broadway Store.

In February, Brandenburg set up a meeting with Perry and Helstern, ostensibly to discuss the communication issues between the two.  During the meeting, Helstern explained that he reigned closely over Perry because her sales numbers were low.  The meeting supposedly then turned into a sort of performance review, culminating in Helstern demanding that Perry generate an Action Plan to outline her goals for improving her sales numbers.  Later, Perry drafted an Action Plan, but Helstern told her it was inadequate.  Around the same time, Limbach told Perry she should step down, because if she could not fulfill the goals in the Action Plan in thirty days, Helstern would fire her.

On February 11, 2011, Perry informed Limbach of her intent to resign.  Limbach passed this information to Brandenburg, who called Perry to set up a meeting about her concerns.  At this meeting on February 16, 2011, Perry reiterated that Helstern spoke to her like a child and was overly critical of her job performance.  Apparently, Brandenburg began to set up interviews with Helstern and Limbach to investigate this matter, but on February 18, 2011, Perry clocked out and never returned to Autozone.

Perry also alleges that Autozone paid its male employees more than its female employees.  As evidence, Perry provides the employment records for Quiney and Harper. Quiney was the Assistant Store Manager at the Broadway Store, in charge of "do-it-yourself" customers.  Autozone hired him as an Assistant Manager in July of 2008 at a wage of $13.00 per hour.  By December of 2008, his wage had increased to $13.34 per hour, and in December of 2009, Autozone paid him $15.41 per hour, a wage he maintained until his termination in August of 2010.  Harper served as the Parts Sales Manager for the Broadway Store, a position evidently lower on the Autozone managerial hierarchy than Perry's position.  When Autozone hired

Harper in December of 2008, his pay rate was $12.00 per hour, and by January of 2009, Autozone paid him $13.50 per hour, his wage upon termination.

By contrast, Perry began her employment with Autozone as a sales clerk in May of 1998 receiving a wage of $7.50 per hour.  By November of 2009, over a decade later and after she began working as a Commercial Sales Specialist, Autozone had increased her pay to $10.44 per hour.  By November of 2010, when Perry served as the Commercial Sales Manager, her pay rate was $11.60 per hour, a wage she continued to earn until she left Autozone.

II.

Perry alleged five counts of unlawful activity against Autozone: sexual discrimination, sexually hostile work environment, quid pro quo sexual harassment, retaliation, and constructive discharge.  Perry brought each claim under both Title VII of the 1964 Civil Rights Act ("Title VII") and the Kentucky Civil Rights Act (the "KCRA").  Autozone moves for summary judgment on each of these counts under Federal Rule of Civil Procedure 56, which entitles a party to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

The moving party bears the initial burden of showing either that no dispute exists as to any material fact or that the nonmoving party cannot prove an essential element of its case for which it has the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once accomplished, the nonmoving party can overcome summary judgment by controverting the moving party's arguments with specific facts.  *Matsushita Electrical Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court need not accept unsupported or conclusory allegations.  *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).  However, the Court will view the record evidence in the light most favorable to the nonmoving party.  *Hawkins v.*

*Anheuser-Busch, Inc.*, 517 F.3d 321, 339 (6th Cir. 2010).   The Court will now address Autozone's arguments in favor of summary judgment as to each of Perry's claims.

III.

Perry alleges a general claim for sexual discrimination in violation of Title VII and the KCRA, but she clarifies in her opposition brief that the basis for the claim is the differential between her wage and the wages of similarly situated male employees only under the KCRA.[2] Kentucky courts analyze disparate wage claims under federal law standards.   *Meyers v. Champman Printing Co. Inc.*, 840 S.W.2d 814, 821 (Ky. 1992).

To establish a prima facie case for wage discrimination, Perry must show that: 1) Autozone paid different wages to employees of different sexes, 2) for equal work performed in positions that require equal skill, effort and responsibility, and 3) for work performed under similar working conditions.   *Prechtel v. Kellogg's*, 2007 WL 1610575, *3 (W.D. Ky. May 31, 2007) (citing *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974))).   "'Equal work' does not require that the jobs be identical, but only that there exist 'substantial equality of skill, effort, responsibility and working conditions.'"   *Buntin*, 134 F.3d at 799 (quoting *Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981)).   To determine whether the work is substantially similar, the Court will examine "an overall comparison of the work, not its individual segments."   *Id.*

A.

Perry presents evidence showing that Autozone paid her appreciably lower wages than her male counterparts.   When hired in May of 1998, Autozone paid her $7.50 to work as a sales clerk.   By the time she parted ways with Autozone over 12 years later, she received a wage of

---

[2] Autozone argues that Perry failed to exhaust her administrative remedies prior to filing this claim, thereby stripping this Court of jurisdiction over the Title VII claim.   Likely as a result of this argument, Perry pursues her sexual discrimination claim under the KCRA, and the Court will dismiss her disparate pay claim under Title VII.

7

$11.60 per hour as a low-level manager.  By contrast, Autozone paid Quiney $13.00 when it hired him as an Assistant Manager in December of 2008, more than Perry ever received.  His wage increased to $14.86 by March of 2009, and when Autozone terminated his employment, Quiney received $15.41 per hour.  When Autozone hired Harper as a Parts Sales Manager in December of 2008, he received a wage of $12.00 per hour, again more than Perry ever received in her more than decade of service with Autozone.  By the time Autozone fired Harper less than two years later, he received $13.50 per hour in the same position.  Perry also presented evidence that Jerry Spencer, a sales clerk at the Broadway Store, received $14.67 per hour in October of 2012, a figure much higher than Perry's wage as an Autozone veteran and manager.[3]  Clearly, Perry has satisfied the first element of a prima facie case for wage discrimination.  Moreover, aside from Spencer, these employees worked at the same store during the same time period, so Perry can prove the third element as well.

The real contest for this claim is whether Perry, Quiney and Harper performed substantially similar work.  During the relevant period of time, Perry was the Commercial Sales Manager, Quiney was the Assistant Manager, and Harper served as the Parts Sales Manager. Divisional Human Resources Manager Rich Thomson characterized the top position at any store as the Store Manager, and the second-in-command as the Assistant Manager.  He further declared, however, that "the commercial sales manager position is a very high stature in the store, as well.  Some may consider that equal to a assistant manager level, just due to the nature of the business and their responsibility."  Thomson Depo., ECF No. 57-3, 44:3-9.  Accordingly, some people within Autozone consider Perry's position commiserate with Quiney's position.  *Id.* at 45:6-9.  Thomson further testified that the Autozone employment hierarchy placed a Parts

---

[3] The Court notes that up to two years had passed between Perry's final wage rate and when Spencer testified as to his pay rate.

Sales Manager directly below the Assistant Manager and Commercial Sales Manager. *Id.* at 45:10-13. It is not a far stretch then that a juror could reach the same conclusions.

However, the Court recognizes that the Commercial Sales Manager deals with business accounts, while the Assistant Manager and Parts Sales Manager appear to handle "do-it-yourself" customers. Quiney and Harper's responsibilities may prove to be so different from Perry's that the work cannot be considered substantially similar. Nonetheless, the Court finds that Perry has presented a genuine dispute as to whether her work was substantially similar to that of Quiney's, and thus Perry has satisfied her burden of proof as to this disparate pay claim.

## B.

The *McDonnell Douglas* burden shifting scheme applies to sexual wage discrimination claims under the KCRA. *See Allen v. Ingersoll-Rand Co.*, 1997 WL 579140, *5 (W.D. Ky. June 17, 1997). Under it, once the plaintiff has established her burden of proof, the defendant is afforded the opportunity to show that the wage differential is based on legitimate, nondiscriminatory reasons. *Buntin*, 134 F.3d at 800-01. Accordingly, Autozone must prove that the wage differential is justified as based on "a bona fide use of 'other factors than sex.'" *Simpson v. Lexington-Fayette Urban Cnty. Gov't*, 2003 WL 22220255, *3 (Ky. Ct. App. Sept. 26, 2003) (quoting *Washington Cnty. v. Gunther*, 452 U.S. 161, 170 (1981)). Autozone has not presented sufficient evidence that it calculated its employees' pay rates based on nondiscriminatory factors, such as merit or seniority, to satisfy its burden. Absent such evidence, Perry's wage discrimination claim under the KCRA survives summary judgment.

## IV.

Perry alleges that DeHaan subjected her to unwelcome and highly offensive conduct of a sexual nature so severe and pervasive that it created a sexually hostile work environment. She

brings this sexually hostile work environment claim under Title VII and the KCRA,[4] and seeks

to hold Autozone liable for her poor working conditions.

> To make out a hostile work environment claim based on sexual harassment,
> each plaintiff must show that: (1) she was a member of a protected class; (2) she
> was subjected to unwelcome sexual harassment; (3) the harassment was based
> on sex; (4) the harassment created a hostile work environment; and (5) there is a
> basis for holding the employer liable.

*Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 477-78 (6th Cir. 2012) (citing

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).

## A.

The first three elements cannot reasonably be disputed.  Perry, as a woman, is protected

under Title VII and the KCRA, and Autozone fired DeHaan for sexually harassing Perry in the

workplace.  In analyzing the fourth element of a prima facie case, the Court must consider the

totality of the circumstances to determine whether the plaintiff has shown that "her environment

was objectively hostile, and also that she subjectively perceived the environment to be hostile."

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) (examining the hostile work

environment claim).  Perry can likely show that she perceived the environment to be hostile,

especially in light of medical records evidencing the amount of stress she was under, allegedly

because of her job situation.  The inappropriate actions that DeHaan admitted taking likely

sustains the objective element, as well.  *See* ECF No. 55-7.

However, the last element setting forth a basis for holding the employer liable for

DeHaan's behavior raises questions.   To impose vicarious liability on an employer for

supervisory sexual harassment,

---

[4] Claims based on sexual harassment, including hostile work environment claims, brought under the KCRA are
analyzed in the same manner as those claims brought under Title VII, so the Court will principally rely upon federal
case law for its analysis in this Part. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005).  Neither
party argues that Kentucky law deviates from federal law under any sexual harassment cause of action.

a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee; if it did, the employer will, *ipso facto*, be vicariously liable.  In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes [the *Faragher/Ellerth*] affirmative defense . . . .

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274-75 (6th Cir. 2009) (quoting

*Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004)) (internal citations and quotations

omitted).   Here, Perry has not alleged that she suffered tangible employment action.[5]

Accordingly, Autozone can only obtain summary judgment by availing itself of the

*Faragher/Ellerth* affirmative defense.[6]

B.

The *Faragher/Ellerth* affirmative defense is summarized as follows:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).  A classic case for application of

the *Faragher/Ellerth* defense is pursuant to a hostile work environment claim.  *See, e.g.*, *id.* at

---

[5]  A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  Perry has not alleged that any of these changes in employment status directly resulted from DeHaan's sexual harassment.  Moreover, the phone call from DeHaan on July 27, 2010 engendered no significant change in Perry's employment status.  The hostile work environment, which Perry alleges arose due to DeHaan's sexually harassing behavior, does not causally link to Perry's resignation in February of 2011, over six months later.  Therefore, Perry could not allege constructive discharge as her tangible employment action.  Even so, the Sixth Circuit interpreted a Supreme Court decision to hold that "constructive discharge, while a potential liability-incurring employment action for the employer, is not a 'tangible employment action' in sexual harassment cases."  *Plautz v. Potter*, 156 F. App'x 812, 819 (6th Cir. 2005) (interpreting *Pa. State Police v. Suders*, 542 U.S. 129 (2004)).

[6]  Autozone also contends this defense absolves it of liability for other claims Perry asserted.  However, because the Court finds that the defense is not available under these circumstances, the Court need not address the defense beyond this section of the opinion.

807.  Though Autozone can probably establish the first prong, it cannot establish the second. This is fatal to the affirmation defense.

i.

In discussing the first prong, the Supreme Court determined that "the need for a stated [antiharassment] policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Faragher*, 524 U.S. at 807-08.  The Sixth Circuit elaborated that "an effective policy should at least require supervisors to report incidents of sexual harassment, allow employees to make both formal and informal complaints of harassment, provide a method for employees to bypass a harassing supervisor when making a complaint, and provide for training concerning the policy." *Shields*, 499 F. App'x at 478 (citing *Clark*, 400 F.3d at 349).  Plaintiffs vigorously challenge Autozone's antiharassment policy as falling short of these four requirements, most notably the supervisory reporting and training requirements, and the Court finds Plaintiffs' arguments persuasive.[7] Assuming *arguendo* that Autozone's antiharassment policy satisfies the *Clark* test,  the Court finds that Autozone exercised reasonable care to prevent and promptly correct the sexually harassing behavior in these circumstances.[8]

---

[7]  The Court notes that the Seventh Circuit found that the Autozone sexual harassment policy satisfied the first *Faragher/Ellerth* prong in *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999).  Although the Seventh Circuit decision is not binding upon this Court, the Court nonetheless finds its reasoning valid and instructive.  In that case, the Seventh Circuit found that Autozone adopted and distributed a specific and detailed antiharassment policy that made clear that sexual harassment is not tolerated and provided mechanisms to promptly resolve complaints.  *Id.* at 811-12.  The Court also found that Autozone trained its employees on the policy.  *Id.* at 812.  The plaintiff did not dispute the facts in *Shaw*, but in the present case, the parties strongly dispute the facts detailing the actual effectiveness of the policy.  The Court finds Plaintiffs' objections as to Autozone's antiharassment policy reasonable, but declines to rule on their correctness at this time.

[8]  Establishing an effective antiharassment policy by *Clark* standards may not be a requirement for the first prong of the *Faragher/Ellerth* defense.  The Supreme Court did not necessarily restrict a defendant's ability to satisfy the first prong to showing an effective antiharassment policy.  *Faragher*, 524 U.S. at 807-08 (holding that "proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law").  The Sixth Circuit seems to always analyze the policy under the *Clark* standards, but like the Supreme Court, may not require an effective policy to satisfy the first prong of this defense.  *See Clark*, 400 F.3d at 349.

All things considered, Autozone's general policy against sexual harassment is clear and functioned properly.  Perry called Brandenburg to report DeHaan's misconduct, showing that Autozone had established the proper mechanisms for employees to report sexual harassment that bypass the harasser and educated its employees as to how to use these channels.  Brandenburg met with Perry the following Monday to hear her complaints.  Brandenburg began formally interviewing Perry and witnesses three days later.  Within two weeks of the initial report, Autozone fired the harasser. After July 23, 2010, Perry experienced no further sexual harassment.[9]  Autozone followed through on Perry's complaint and terminated the offending employee.  Thus, Autozone's actions were reasonably calculated to prevent and correct the sexual harassment, and in fact, effectively ended the sexual harassment.  The Court concludes that this evidence could establish that Autozone acted reasonably under the first element of the *Faragher/Ellerth* defense.

ii.

Regardless, Autozone cannot meet the second prong of the *Faragher/Ellerth* defense. The Court finds that Autozone has not shown that Perry unreasonably failed to take advantage of Autozone's preventive or corrective opportunities.  Though the first instance of DeHaan's harassment began on or around June 14, 2010, the systematic harassment did not actually begin until two weeks later.  Perry waited three weeks to formally complain of DeHaan's behavior. During this time, Perry attempted to resolve the issue personally, by asking and demanding that DeHaan cease his inappropriate conduct.  She had worked at Autozone for over ten years at this point, and apparently planned on continuing her employment with Autozone.  It is sensible to

---

[9] Perry claims DeHaan subjected her to further harassment by calling her, criticizing her work performance, and declaring that her transfer would be permanent as Helstern was replacing her with a new Commercial Sales Manager at the Broadway Store.  While this phone call is certainly sophomoric, the Court does not find that this conduct rose to the level of harassment or that the phone call evidenced an inability of Autozone to protect and correct the sexual harassment.

believe that complaining of sexual harassment to supervisors may result in serious consequences for all those involved, and Perry's hesitancy in reporting DeHaan was understandable.  A juror may appropriately find that Perry's three-week delay in reporting DeHaan was reasonable under the circumstances.  Accordingly, Autozone cannot avail itself of the *Faragher/Ellerth* defense, and Perry's claim survives.

C.

The Court finds an inherent problem with its application of the *Faragher/Ellerth* defense. Here, Autozone acted with reasonable care to promptly prevent and correct the sexual harassment, and Perry availed herself of the mechanisms by which she could mitigate further harm. At best, the system worked as it should.  Holding a company vicariously liable under such circumstances may at first seem unjust and contrary to much of the agency discussion in *Faragher* and *Ellerth*.  No affirmative defense is available to a company with a valid complaint system that demonstrably works, as is apparent from this case, simply because the employee reasonably takes advantage of the process the employer created for her.   That the *Faragher/Ellerth* defense requires proof of the second element certainly circumscribes its applicability, essentially negating it where the employee avails herself of the complaint procedures.

However, the Court recognizes that the Supreme Court intended the *Faragher/Ellerth* affirmative defense to encourage the promulgation of an effective antiharassment policy by *allaying* an employer's exposure where it had generated such a policy.  The "strict liability [] imposed on employers for the harassing conduct of their supervisors" remains an important protection for victims of workplace harassment and discrimination.  *Clark*, 400 F.3d at 348. Moreover, the *Faragher/Ellerth* defense encourages the prompt reporting of inappropriate

14

behavior, and under these circumstances, does not stand to punish the victim for utilizing those avenues available to her to prevent further injury.  Because this Court is compelled to follow Supreme Court and Sixth Circuit precedent, the Court cannot cloak Autozone in this defense. Accordingly, Perry's sexually hostile work environment claim survives summary judgment.

V.

Plaintiff's third claim is for quid pro quo sexual harassment.  Specifically, Perry claims that DeHaan subjected her to adverse employment actions because she denied his requests for sexual favors and rejected his sexual advances.  An employer can be held vicariously liable for quid pro quo sexual harassment "for the conduct of supervisory employees having plenary authority over hiring, advancement, dismissal and discipline under the theory of respondeat superior."  *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986).

> To prevail on a *quid pro quo* claim of sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability.

*Id.*  The parties do not dispute the first three elements of Perry's claim.  However, the parties disagree as to whether Perry satisfied her burden as to the final two elements.

Perry does not allege that job benefits were contingent upon submission to DeHaan's advances.  So, the relevant inquiry as to the fourth element is whether Perry suffered a tangible job detriment, a term which the Sixth Circuit uses interchangeably with "materially adverse employment action".  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 n.5 (6th Cir. 2000).

The Sixth Circuit defines an adverse employment action as follows:

> A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)).  "The Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable." *Bowman*, 220 F.3d at 462.

Autozone argues that the only possible tangible employment action that Perry could allege resulted from the quid pro quo sexual harassment was a phone call from DeHaan to Perry, wherein he states that Autozone was permanently transferring her to the Shively Store.  The Court construes this phone call as a *de minimis* employment action.  Perry only worked at the Shively location for a short period and returned to permanent employment at the Broadway Store upon DeHaan's termination.  The phone call was not materially adverse.

Although it is a bit unclear, Perry also seems to assert that the CAR issued to her on August 10, 2010 for her failure to report her own sexual harassment earlier constituted an adverse employment action.[10]  This is so, she argues, because the CAR was an affirmative step towards termination.  Generally, "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary."  *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007).  However, a negative performance review may constitute an adverse employment action where the employee can "point to a tangible employment action that she alleges she suffered, or is in

---

[10] Autozone argues that the August 10, 2010 CAR was not in fact a CAR, because Helstern noted on the CAR that it was a "documentation of a verbal conversation", and consequently was non-disciplinary in nature.  The Court need not address this issue and will assume that the CAR was in fact disciplinary.

jeopardy of suffering, because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000). In *Tuttle*, the Sixth Circuit linked the negative performance review to the plaintiff's transfer. 474 F.3d at 322-23. The Court found that the performance review thus constituted an adverse employment action. *Id.*

Here, Perry has not linked her CAR to any adverse impact on her employment status. Certainly, her subsequent resignation from Autozone, which occurred approximately six months later, is not related to the CAR. Perry also does not support the contention that she was under any real threat of termination or further disciplinary action, despite the warnings on the CAR and Helstern's comment that she could be further disciplined for her failure to follow Autozone policy in the future. The Court is not obliged to accept conclusory statements to this end, and the evidence supports the opposite conclusion.

During this time, Perry continued to work as a Commercial Sales Manager at the Broadway Store, except when she took medical leave for injuries sustained in a car accident. No evidence suggests that the CAR affected Perry's pay rate or resulted in a reduction in her job responsibilities. For these reasons, despite the fact that issuing a CAR to an employee for a delay in reporting her own sexual harassment seems wholly inappropriate and unprofessional, its issuance was not an adverse employment action. Therefore, Perry cannot establish a prima facie case for quid pro quo sexual harassment.

VI.

Finally, Perry alleges two separate claims for retaliation: first, that Autozone created a retaliatory hostile work environment, and second, that Autozone subjected her to a retaliatory

constructive discharge.[11]   After addressing each claim separately, the Court concludes that only the first survives.

### A.

Perry contends that Autozone retaliated against Perry due to her complaint to Autozone's Human Resources Department of DeHaan's inappropriate behavior by making her work in an intolerable environment.   The Court's earlier sexual hostile work environment analysis does not necessarily satisfy the inquiry for a retaliatory hostile work environment claim.   *See Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 751-54 (S.D. Ohio 2011) (analyzing in successive but distinct sections a hostile work environment claim and a retaliatory hostile work environment claim); *Maxwell v. City of Columbus*, 2011 WL 2493525, *10 n.3 (S.D. Ohio June 21, 2011); *Dobson v. City of Gallatin*, 2006 WL 3805659, *12-14 (M.D. Tenn. Dec. 22, 2006).   First, the two claims require the plaintiff to prove different prima facie elements.   *See Jones*, 823 F. Supp. 2d at 751-54.   Second, Perry based her sexual hostile work environment claim on DeHaan's behavior towards her, whereas the retaliatory hostile work environment claim focuses on the events after Perry reported DeHaan and Autozone fired him for sexual harassment.   ECF No. 1-2.   Thus, the retaliation claim has a broader scope and concerns a wider array of actors and incidents.   Accordingly, the Court will engage in a new analysis.

### i.

The Sixth Circuit determined,

> To prevail on a Title VII claim of retaliatory hostile work environment a plaintiff must show  (1) she engaged in activity protected under Title VII; (2) the defendant was aware that the plaintiff engaged in the protected activity; (3) the plaintiff suffered "severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the . . . harassment."

---

[11] Courts are to evaluate retaliation claims brought under the KCRA using the same standards that federal courts apply to Title VII claims.  *Hamilton v. Gen. Electric Co.*, 556 F.3d 428, 434 (6th Cir. 2009).

*Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012) (quoting *Morris*, 201 F.3d at 792).   The Court should consider the totality of the circumstances when determining whether a hostile work environment existed, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Williams*, 187 F.3d at 562.

Perry easily satisfies the first two elements of a retaliation claim.  She engaged in a protected activity when she reported her sexual harassment, and she reported this sexual harassment to Autozone, which establishes the employer's knowledge of the protected activity.

ii.

The real question here is whether Perry presented enough evidence to show that Autozone subjected her to severe and pervasive retaliatory harassment, and whether Autozone harassed her as a result of her protected activity.  To this end, Perry must demonstrate that the harassment was both subjectively and objectively severe and pervasive.  *Willey v. Slater*, 20 F. App'x 404, 406 (6th Cir. 2001) ("Both an objective and a subjective test must be met: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.").  Perry clearly felt that Helstern, Brandenburg, and Limbach created a hostile work environment, as evidenced in her deposition testimony.  Whether Autozone's conduct was objectively hostile or abusive is a close call.

Perry claims that a number of Helstern's actions cumulatively constituted harassment: 1) when she reported that employees called her "a bitch for getting those men fired," Helstern told Perry to get thicker skin; 2) Helstern told her that she had no right to question him about the

manner in which he spoke to her; 3) Helstern accused her of sliding parts to commercial customers for free and colluding with them to steal from Autozone; 4) he called her three to four times per day, including once before work inquiring why she was not there before her shift started and thus ensuring a message was waiting for her upon her arrival; 5) Helstern constantly questioned whether Perry was present and listening on conference calls and would quiz her about the content of conference calls; and 6) he would frequently talk to her like she was a child.

Perry further alleges that other Autozone employees did not properly respond to her complaints of Helstern's behavior.  For example, she complained to Store Manager Limbach about Helstern's behavior in the fall or winter of 2010, and he allegedly failed to report these incidents or take any corrective action.  Perry requested leave to transfer to the Shively Store on February 4, 2011, but Brandenburg refused the transfer unless Perry signed a formal request for transfer, which she declined to do.  When Brandenburg set up a meeting between Helstern and Perry to purportedly discuss communication issues between the two, Perry claims Helstern turned the meeting into a performance review session.  He required her to prepare an Action Plan for obtaining better sales.  Evidently, Limbach suggested she resign, because Helstern would terminate Perry if she did not perform the Action Plan within thirty days.

As to the final element, the temporal proximity between Perry's complaint and these allegations suggests a causal connection, as does the content of the exchanges between Perry and Helstern.  Additionally, some statements in the record indicate that DeHaan and Helstern were close friends.

The Court notes that the retaliatory hostile work environment claim itself invites the Court to engage in a much closer policing of inter-office conduct than is typical in a Title VII analysis.  This case is emblematic of the problem.  Helstern's actions were potentially intrusive.

Brandenburg and Limbach's responses seem dismissive. Determining the objective reasonableness of such discrete behavior is difficult. However, viewing the facts in a light most favorable to Perry, the Court finds that a juror may find that Autozone subjected Perry to severe and pervasive harassment as a result of her complaint about DeHaan, establishing a prima facie case for retaliatory hostile work environment.

iii.

Retaliation claims based on circumstantial evidence are subject to the *McDonnell Douglas* burden shifting scheme. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). According to this scheme, once the plaintiff has proven a prima facie case for the retaliation, the burden upon summary judgment shifts to the defendant to show legitimate, nondiscriminatory reasons for its actions. *Id.* If the defendant is successful, the burden shifts back to the plaintiff to show "by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Id.*

The parties did not address these phases of the retaliation analysis in their extensive briefs. The only arguments the Court can glean are as follows: While Autozone contends that Helstern acted in such a way because Perry's department was underperforming, it offers no argument explaining Brandenburg and Limbach's actions. Perry contends Helstern's reasons had no basis in fact, because the Commercial Sales Department always produced poor sales numbers. Thus, according to Perry, the timing of Helstern's more abrasive behavior towards her suggests this conduct must have resulted from another animus.

Some of Helstern, Brandenburg and Limbach's actions are bizarre and unexplainable. After examining the full record, the Court finds that a reasonable juror could conclude that Autozone created a hostile work environment in retaliation for Perry's complaint.

B.

Finally, the Court will examine Perry's retaliatory constructive discharge claim. Specifically, Perry argues that in retaliation for her complaint about DeHaan, Helstern, Brandenburg, and Autozone made Perry's work environment so intolerable that a reasonable person would have felt compelled to resign, thereby effectuating a constructive discharge.

"To demonstrate a constructive discharge, Plaintiff must adduce evidence to show that 1) the employer . . . deliberately created intolerable work conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." *Logan v. Denny's Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (internal quotation marks and citation omitted).   The Court must consider both the employer's intent, which can be shown by demonstrating that the employee's resignation was a foreseeable consequence of the employer's actions, and the employee's objective feelings, which involves examining whether the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987)); *Logan*, 259 F.3d at 569; *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).  The Sixth Circuit instructs courts to consider whether the following conditions existed in analyzing constructive discharge claims:

> (1) a demotion; (2) reduced salary; (3) reduced job responsibilities; (4) a reassignment to menial or degrading work; (5) a reassignment to work under a younger supervisor; (6) badgering, harassment or humiliation by the employer designed to encourage the employee's resignation; and (7) offers of early

22

> retirement or continued employment on terms less favorable than the
> employee's former status.

*Kinamore v. EPB Elec. Utility*, 92 F. App'x 197, 205 (6th Cir. 2004) (citing *Logan*, 259 F.3d at 569).

Perry offers evidence that Helstern may have badgered or harassed her.  But the evidence shows nothing more.  Brandenburg initiated a meeting between Helstern and Perry with the intent to resolve their communication issues.  When Limbach informed Brandenburg of Perry's plan to resign, Brandenburg took steps to begin an investigation into Helstern's behavior by attempting to schedule interviews and conduct more Question and Answer sessions with relevant witnesses.  Autozone did not reduce Perry's wages, demote her, decrease her responsibilities, or perform any other material adverse employment actions relating to her work performance under Helstern that would suggest Autozone intended to induce her to resign.  The Court finds no evidence to prove that Autozone intended Perry to resign or that her resignation was a foreseeable consequence of its actions.  Accordingly, Perry's constructive discharge claim fails.

VII.

Finally, based upon the oral discussion with counsel, the Court has reconsidered its Memorandum Opinion which granted Autozone summary judgment on Harper and Quiney's claims for retaliatory termination.  For the reasons that follow, the Court now concludes that those claims survive summary judgment and should be reinstated.

First, Plaintiffs argued that the Court should change its retaliation ruling based upon the Supreme Court's holding in *Crawford v. Metropolitan Government of Nashville*, 555 U.S. 271 (2009).  *Crawford* addresses the question of whether Title VII protects an employee from retaliation based upon participation in an investigation.  The Court acknowledges the potential application of *Crawford* in these circumstances.

23

In its prior Memorandum, the Court concluded that the evidence could not sustain a causal link between Plaintiffs' participation in the investigation and their terminations. The Court now reconsiders that conclusion and recognizes that the views expressed on page 20 of the prior Memorandum are but one possible reasonable interpretation of events. Autozone seems to recognize that other interpretations are reasonable, as it conceded that Plaintiffs could establish a prima facie retaliation claim. Despite the Court's sound view that Autozone terminated Harper and Quiney for their failure to report rather than their participation in the investigation, reasonable people could reach other conclusions. From a factual viewpoint, Plaintiffs' failure to report and their participation in the investigation became known to Autozone at the same time. The terminations occurred within a week. The Court now recognizes that the actual reasons for the terminations are unclear, and the stated reasons could be pretextual. In fact, viewing the facts favorably for the Plaintiffs, the stated reasons are just as possible as alternative biases based on race or retaliation. Moreover, from a legal viewpoint, the finding of pretext in Autozone's terminations of Harper and Quiney in the racial discrimination context also establish grounds for pretext in the retaliation context.

For these reasons, the Court concludes that Harper and Quiney are entitled to take their retaliation claim to a jury.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant Autozone's Motion for Summary Judgment as to Plaintiff Perry's disparate pay claim is SUSTAINED as that claim is brought under Title VII and DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Autozone's Motion for Summary Judgment as to Plaintiff Perry's disparate pay claim is DENIED as that claim is brought under the Kentucky Civil Rights Act.

IT IS FURTHER ORDERED that Defendant Autozone's Motion for Summary Judgment as to Plaintiff Perry's claims for quid pro quo sexual harassment and retaliatory constructive discharge is SUSTAINED and these claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendant Autozone's Motion for Summary Judgment as to Plaintiff Perry's claim for a sexually hostile work environment and retaliatory hostile work environment is DENIED.

IT IS FURTHER ORDERED that upon reconsideration, Harper's and Quiney's claim of retaliation based upon their terminations is REINSTATED.

The remaining claims are (1) Harper's and Quiney's claims for racial discrimination and for retaliation, each based on their terminations, and (2) Perry's claims for state law racial discrimination based on disparate pay, sexually hostile work environment and retaliatory hostile work environment.

cc:    Counsel of Record

25